ESTATE OF MARTIN (Charles) : ESTATE OF MARTIN (Nellie) : BARRY and others, Appellants, v. RICHARDS, Trustee, Respondent.

*September 4—November 1, 1963.*

For the appellants there were briefs by *Petersen, Sutherland, Axley & Brynelson,* attorneys, for Veronica Barry, Joan Gefke, and Jeanne Caine, and by *John Gerlach* of counsel, for Bernard Martin, and oral argument by *James C. Herrick,* all of Madison.

For the respondent the cause was submitted on the brief of *Tom C. Brown* of Oregon, and *Jay W. Winter* of Madison.

HALLOWS, J. The difficulty in this case arises from the manner in which the trust was created and administered and the lack of records reflecting its administration. The trial

court observed in its written decision the defendant indulged in some questionable practices in respect to his duty as trustee and endeavored to co-operate with the widow and her family to the fullest extent and relied heavily on their mutual attorney. In approving the accounts, the trial court stated the defendant "rendered as accurate and detailed a report and account as available data made possible." The basic questions are whether such data was sufficient and what were the duties of the defendant as trustee to keep an account under the circumstances.

Defendant argues he was a "trustee for convenience," relying on the *Estate of Lenahan* (1951), 258 Wis. 404, 46 N. W. (2d) 352. A trustee for convenience in Wisconsin is a unique concept and apparently is applied to both real and personal property. When a life estate with the remainder over is created in property, especially personal property of the nature which may be transferred or appropriated, a risk exists that the remainderman might not receive the property the testator intended he should have. The problem of securing a future interest in personal property has long been a problem confronting the courts and there is historic authority for a court's requiring security of the life tenant by way of a bond in cases involving intangibles, money, or quasi-negotiable personalty.[1] The trust device has also been used to protect the owner of a future interest in personalty.[2] Apparently a judicial trust is a more-modern approach and finds sanction in the hazard to the owner of the future interest in personalty or on the basis of an implied intent as the trust will not be established by the court if the will mani-

[1] Nemmers, The Right of the Owner of a Future Interest in Personalty to Security, 1943 Wisconsin Law Review, 229; Simes and Smith, Law of Future Interest (2d ed.), p. 55, sec. 1712.

[2] See Restatement, 2 Property, Future Interests, introductory note, p. 814, and p. 820, sec. 200.

fests a contrary intent.[3] The trust device or the requirement of security did not apply to a life estate involving land because such property was not destructible, could not be removed from the jurisdiction, or secreted. At common law there were remedies to protect the remainderman from waste by the life tenant and the recording acts protected him against rights arising in third parties. We do not approve of keeping a probate proceeding open for the duration of the life of the life·tenant in order to insure some protection to the owner of the future interest. This procedure is impracticable and inevitably leads to more difficulties than it solves. The practice of closing the proceeding and appointing the life tenant, usually the wife, a trustee, has also led to difficulties and inconvenience. See *Estate of Cobeen* (1955), 270 Wis. 545, 72 N. W. (2d) 324, which seems to imply a trust from the creation of a life estate in real and personal property with a remainder over.

In *Lenahan* the will devised and bequeathed real and personal property to the wife for her use during her life with the right of invasion of principal and the remainder over to the testator's son. The final judgment assigned only that part of the estate consisting of personal property to the wife in trust. This court approved such procedure as common practice where a life estate is created in personalty by the will as "an orderly and efficient means of carrying out the terms of the will" even though a trust was not provided for in the will by express words. However, the creation by the final judgment of a trust not only of personalty but of real estate where the will created a life estate was justified in *Estate of Larson* [4]

---

[3] Restatement, 2 Property, Future Interests, p. 828, sec. 202, and comment; Simes and Smith, Law of Future Interest, *supra,* p. 59, sec. 1713.

[4] *Estate of Larson* (1950), 257 Wis. 579, 44 N. W. (2d) 535; *Estate of Larson* (1952), 261 Wis. 206, 52 N. W. (2d) 141.

without noting that historically a trust for security of the remainderman was restricted to personalty. Part of the justification was on the principle a life tenant while not a "pure trustee" was in a sense a trustee in relation to the remainderman. In both *Lenahan* and *Larson* the life tenant was designated the trustee, and the legal title was vested in the wife in trust for her own benefit as life tenant. By this means, presumably the probate courts attempted to retain jurisdiction over the life tenant in a trustee capacity and imposed the requirements of filing annual accounts as a trustee, which would not be the obligation of a life tenant. The efficiency, of course, of such a device does not reach the degree nor provide the protection obtained which a trustee with legal title for the benefit of the life tenant and remainderman would accomplish. Whatever benefits may be derived from the use of the life tenant-trustee device as a practical method of administration it should be distinguished from a trust implied by the court from the terms of the will and from a trust expressly created in the will.

In the instant case the will appointed a trustee other than the life tenant and granted to him a power of sale as to the real estate. The final decree conveyed the property not to the trustee but to the wife and then to the remaindermen in the terms of the will creating the life estate. We thus have a situation where a trustee is appointed by the final decree without legal title to what might be considered the trust res. Trust property, however, need not consist of the legal title to the subject matter of the trust but some interest in property is necessary. Here, the power of sale of real estate was given to the trustee and would be technically sufficient to sustain a trust. Restatement, 1 Trusts (2d), p. 7, sec. 2, comment *c*, see also p. 212, sec. 88. In the operation of the trust, all the parties considered the trustee's duties went beyond the mere exercise of the power of sale and included the carrying out of the terms of the will. The defendant undertook the adminis-

tration of all the property. As to some assets, it was supervisory; as to others, it was complete control. We consider the defendant a trustee of a trust not impressed by the court in the exercise of its inherent power as an administrative device but created by the will and because of the circumstances the defendant had fiduciary duties respecting the property to which he did not have legal title. If there were any question of the scope of his duties, the trustee should not have waited ten years before claiming his rights were less than those which, in fact, he exercised.

It is contended by the defendant he has accounted for all property and income which came into his possession and also for the property which did not come into his possession. This argument can only be sustained, as the trial court did, on the theory the accounting was as good as the available data permitted. The conclusion of the legal sufficiency of such data is based on the *Estate of Larson* (1952), *supra,* which is not controlling. That case involved a final account by the executor of a life tenant-trustee who failed to keep complete data and records. Upon the death of the life tenant, her executor made as good an accounting as the data kept by the life tenant-trustee permitted. The only question involved was whether the life tenant was entitled to the unused and accumulated income, which the court held she was. On that premise and the fact the account was as accurate and detailed as available data permitted, the accounts were approved.

In the instant case we are dealing with a lack of data and records of a trustee who has no beneficial interest in the property. However one may handle his personal affairs, a trustee has the duty to keep proper accounts of his stewardship. The responsibility and duties of a trustee are not to be lightly assumed or carelessly executed. Good faith in their performance alone is not sufficient. *United States Nat. Bank & Trust Co. v. Sullivan* (7th Cir. 1934), 69 Fed. (2d) 412. We need not dwell to any extent on the duties to keep clear,

distinct, and accurate records of all the transactions of a trustee. They are adequately and comprehensively set forth in the *Will of Leonard* (1930), 202 Wis. 117, 230 N. W. 715. The final account of a trustee should show in detail the items expended and show when, to whom, and for what purposes the payments were made so the beneficiaries can make a reasonable test of the accuracy of the accounts. The accounts should be clear and accurate and if they are not, all presumptions are against the trustee and all obscurities and doubts are to be taken adversely to him. *Will of Leonard, supra;* Restatement, 1 Trusts (2d), p. 376, sec. 172; Bogert, Trusts & Trustees (2d ed.), p. 10, sec. 962; 2 Scott, Trusts (2d ed.), p. 1287, sec. 172. We do not think when trusts of long duration are involved it is good trust practice for a trustee to wait until the termination of the trust to have his accounts for the full period approved. This, of course, he can do under sec. 323.01(4), Stats. Much difficulty and litigation would be avoided if periodically, perhaps at five-year intervals, the annual accounts were settled and that period of administration put at rest.

It is not necessary to recite all the factual details giving rise to this controversy. The property at the termination of the probate proceedings after ten years of administration consisted of a one-half interest in two farms, a one-half interest in a bowling alley and tavern, one half of a vendor's interest in a land contract, other real estate, ten shares of bank stock, cash, and an interest in the farm personal property. During the administration of the trust some of the real estate was sold, the stock transferred to the wife, and there were changes in farm personal property and other changes in the assets. One of the principal assets was the so-called Fincher farm which was operated on shares with a tenant. The day-to-day operation of the farm had been managed by Fincher during the administration of the estate and during the trust. Fincher kept no records of the farm operation but

all the receipts were deposited in a bank of which the defendant was president in an account labeled Fincher-Martin from which disbursements were made by check. As deposits were made the defendant had a bank employee keep track of the purposes and the amount of the deposits in deposit books. Besides these books the farm transactions are shown by bank ledger sheets and canceled checks, some of which are missing. It was agreed from this account $100 should be paid out of the income monthly to Fincher and to the defendant. The $100 received by the defendant was deposited in another account known as the C. R. Martin Trust Account. Out of this account the life tenant was paid $125 per month and other payments. This is the only real trust account kept by the trustee. In this account the defendant also kept his share of the receipts from the bowling alley and tavern, which property was actually managed by another person. Transactions are evidenced by bank-ledger sheets, checks, and a book in which the defendant made the entries. Payments on the land contract were kept in an account known as the Martin-Martin Account and some expenses of the bowling alley paid therefrom.

In proving the accounts the defendant first accounted only for the actual money he received and disbursed. This involved only as income in the C. R. Martin Trust Account the transfers from the Fincher-Martin Account. His amended accounts attempted to reflect the operation of the farm. The practical difficulty in attempting this was the lack of completeness of records kept to reflect these transactions. The difficulty was further compounded by lack of supporting receipts and vouchers for disbursements and the loss or destruction of checks written for the farm operations for two periods amounting to some four years. To overcome these deficiencies, the defendant used copies of the tax returns of Fincher and of the tenant to prove certain disbursements in connection with the farm. The defendant's trust tax returns

included the farm operation but that part of his returns was prepared annually from copies of the tax returns of Fincher. Basically, the final account so far as it reflected the farm operation was constructed from copies of tax returns.

The plaintiffs contend the final accounts could not be properly approved on such evidence and were also incorrect in their reflection of the activities of the trustee. They point out a sizable discrepancy in the amount of receipts deposited in the bank in the farm account and the receipts reported in the final account. The accounts of the defendant do not reflect all receipts deposited according to the bank records or all the receipts according to the record kept on behalf of the defendant by a bank employee. It may be that some of the bank deposits represented principal and not farm income but if so, the accounts should be clearly reconciled on that basis. Likewise, the disbursements in the accounting do not balance with the checks written on the Fincher-Martin Account. There may be a legitimate explanation for this discrepancy but it is not apparent from the accounting. We must hold there is merit to the plaintiffs' contention in respect to the accounting of the farm operation and the final account should not have been approved. The tax returns or copies thereof orally verified by Fincher are not admissible under sec. 327.25, Stats., relating to the "shop rule." They may be admitted for what they are worth in probative value but their use for such purpose is limited and only raise some inference of proving parts of the defendant's accounts. Approval of the accounts cannot rest on them alone.

The plaintiffs also contend the so-called C. R. Martin Trust Account does not balance and we find merit in this contention. We point out there are some entries in Exhibit 52 made after the cutoff date of August 25, 1961, which cannot be used to balance the account as of that date. The defendant contends his account does not have to reflect the farm personal property on the theory it belonged to the life

tenant when the probate proceeding was closed. The first annual trust account carried this item at the value originally listed in the estate ten years earlier and not in the amount assigned by the final decree when the trust was created. This item was subsequently dropped from the annual accounts. We cannot agree the farm personal property belongs to the life tenant at the end of the administration of the estate or of the trust. In considering deteriorating but nonconsumable property, one line of authority holds the remainderman is entitled only to such property as remains and in the state in which it is left by the life tenant—the life tenant being liable only for waste, unauthorized use or misuse of the property, and for loss through negligence. The other cases take a stricter view of the rights of the life tenant where there is a general bequest and an absence of a contrary intention and imply the life tenant must account for such property to the remainderman at its value at the time of the commencement of the life estate. The rules are applicable to trusts and to farm animals. Annos. 77 A. L. R. 759; 170 A. L. R. 133; 33 Am. Jur., Life Estates, Remainders, Etc., p. 720, sec. 234; Bogert, Trusts & Trustees (2d ed.), p. 356, sec. 819. Here, part of the trust consisted of an interest in a herd of farm animals which was owned jointly with Fincher and the tenant on the farm. They were necessary to the operation of the farm and its production of income for the owners. We consider the latter rule applicable here and, therefore, the offspring or increase should under these circumstances be treated as principal to the extent necessary to maintain the original herd of cattle and the remainder should be deemed income so far as this trust was concerned regardless of how the progeny were treated for tax purposes or by the tenant and Fincher. If the integrity of the herd cannot be maintained by the offspring, replacement should be made from other income. Of course, the trustee is not an insurer and any loss or damage of such personal property by causes other

than acts or omissions of the trustee in violation of his duties is chargeable to principal. However, loss through aging or natural death is to be replaced in the normal process of maintaining the herd. This rule obviously does not apply to the farm machinery and tools of husbandry. Since we cannot go behind the final decree which assigned farm personal property of a value of $3,842.26, that value must be accounted for in the final account of the trustee and may be represented by an interest in specific cattle, cash, or other assets.

The plaintiffs also contend the ten shares of bank stock should be accounted for. We agree. While the life tenant was entitled to the income therefrom, we find no justification for transferring the shares of stock to her as her own property. This appears to be a diversion of principal which should be eventually charged against the widow's interest in the income of the trust. An item of $1,100 interest is claimed by the plaintiffs not to be a proper disbursement from the trust. This interest was paid on the promissory note of Nell Martin to Sadie Fincher, and if it is determined to be a personal debt of the life tenant, the payment by the trust should be charged to her share of the income. Apparently a claim for the principal of the note has been made against the estate of the life tenant. The plaintiffs also complain the trustee's attorney's fees were allowed as an expense of the trust. Allowance of such fees is in the discretion of the court and since further proceedings must be had, this item should be re-examined. Additional expenses for attorney's fees, accountant's fees, and the like may be charged personally to the trustee instead of to the trust where the negligence or the malfeasance of the trustee necessitates the incurring of such expenses. A trustee found to be derelict in his duty cannot expect the trust to finance his defense. *Joerres v. Koscielniak* (1961), 13 Wis. (2d) 242, 108 N. W. (2d) 569; *Mackin v. Hobbs* (1905), 126 Wis. 216,

105 N. W. 305; Bogert, Trusts & Trustees (2d ed.), pp. 213, 216, 217, sec. 971, and p. 404, sec. 980; 2 Scott, Trusts (2d ed.), p. 1287, sec. 172; 54 Am. Jur., Trusts, p. 423, sec. 538.

The further accounting should include both the income and the principal, showing clearly what has happened to the principal. If improvements have been made to the property, the allocation of the cost thereof, if any, and the liability therefor should be determined. We suggest the detailed points and objections of the plaintiffs made on this appeal be determined and ruled upon separately on the remand of this case. The defendant should be given the opportunity to amend his accounts.

There is some claim made in the record for which we can find no justification that the plaintiffs have waived any diversion of principal for the benefit of the life tenant. If there were a waiver, it does not justify a shortcut in the accounting or waive the necessity of the trustee's showing in his accounts clearly and accurately the transactions, whether or not the defendant is to be held liable or surcharged with a diversion of the principal or corpus. We deem the defendant's liability for surcharge, however, to be an issue in this proceeding. A distinction must be made in two uses of the term "to account," one, the liability of making a financial accounting supported by adequate data and the records and, the other, the liability which arises from the failure to act or the wrongful activities of the trustee in carrying out his duties.

The defendant contends the burden of proof is on the plaintiffs to show loss or damage and failing this, the trustee's account should be approved. We do not agree. It is the primary duty of the trustee to make full, accurate, and complete accounts. It is not the duty of the appellants to supply the omissions. *Will of Leonard, supra; Will of Roebken* (1939), 230 Wis. 215, 283 N. W. 815; Bogert, Trusts &

Trustees (2d ed.), p. 10, sec. 962; 54 Am. Jur., Trusts, p. 405, sec. 509; Anno. 13 A. L. R. 364.

It is claimed by defendant the conduct of the defendant in co-operating with the life tenant and not interfering or causing her any inconvenience in disturbing the management of some of the property as it was administered for some ten years prior to the establishment of the trust and known to the plaintiffs justifies barring their claims on the ground of laches. Perhaps the widow did not understand her limited interest as a life tenant, but if the trust was to serve its purpose it was the duty of the trustee to fulfil his duties even though some inconvenience or annoyance to the life tenant resulted. The long, friendly relationship which existed between the trustee and the life tenant cannot serve as an excuse for the failure of the trustee to fully perform his duties. We find no laches on the part of the plaintiffs and the defendant cannot defend his lack of keeping adequate records on that doctrine.

We call the trial court's attention to an apparent violation by the defendant of the court's order which required all parties to bear their own accountant's cost. We note in Exhibit 52 an entry dated November 7, 1962, of a payment for accounting services.

*By the Court.*—Order appealed from is reversed with directions for further proceedings not inconsistent with this opinion.